The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Lorrie L. Dollar and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioner and enters the following Opinion and Award.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. An employee-employer relationship existed between the parties at all relevant times.
3. The defendant was a duly qualified self-insured, with Crawford Company as the servicing agent.
4. The plaintiff contracted a compensable occupational disease, bilateral carpal tunnel syndrome, as a result of her employment with the defendant.
5. The parties submitted one hundred fifty-nine pages of medical reports and file documents, which have been marked as Stipulated Exhibit l.
***********
Based upon all of the competent evidence of record, the Full Commission makes the following additional
 FINDINGS OF FACT
1. At the time of the hearing, the plaintiff was a thirty-two year old high school graduate, who was the mother of two children, one age seven and the other age two.
2. The plaintiff has been employed by the defendant since 1985. She has worked on the night shift since 1991. On 11 September 1992, the plaintiff began to experience problems with her hands while she was working on the bird-hanging line. She reported this to her employer and was instructed to seek medical treatment with her family doctor, Dr. Melvin Clayton. Dr. Clayton diagnosed plaintiff with bilateral carpal tunnel syndrome on 18 September 1992. On 5 October 1992, an EMG was performed.
3. In May of 1993, the defendant filed a Form 19 reporting plaintiff's right carpal tunnel syndrome. The plaintiff filed a Form 33 on 21 June 1993, seeking a change of physician.
4. On 4 November 1992, Dr. Clayton referred plaintiff to orthopedist, Dr. J. Bloem in Rocky Mount, North Carolina, where physical therapy and splints were ordered. On 18 December 1992, Dr. Bloem injected plaintiff's wrists. The plaintiff was last seen by Dr. Bloem on 29 January 1993.
5. On 18 March 1993, Dr. Bloem referred plaintiff for a second opinion to Dr. Thomas Bergfield. Dr. Bergfield diagnosed plaintiff with bilateral carpal tunnel syndrome with right worse than left.
6. An Order of Removal was filed on 29 September 1993, after the parties advised that the plaintiff would be permitted to change her treating physician from Dr. Bloem to Dr. Bergfield in Chesapeake, Virginia.
7. The plaintiff returned to Dr. Bergfield on 21 October 1993 complaining of achy forearm and digital pain with numbness in her fingers while operating the giblet machine. On 18 November 1993, plaintiff complained of wrist and hand pain but not numbness to Dr. Bergfield.
8. On 2 February 1994, Dr. Bloem placed plaintiff in light duty work, which involved no use of knives or scissors. The plaintiff was to rotate to the giblet machine when operators were on breaks, where she used her hands to grab the gizzard, neck, heart and liver, and place them into slots. She performed this on twenty minute intervals for employees. The plaintiff worked from then until September of 1995 when she delivered her second child.
9. Beginning on 20 February 1996, plaintiff began receiving medical treatment by Dr. Robert Hansen of Southeastern Neurology, who was on contract to provide medical services at the defendant's Wellness Center. Dr. Hansen is board certified in neurology and clinical neurophysiology. The plaintiff complained of arm and upper body pain. Dr. Hansen diagnosed carpal tunnel syndrome and fibromyalgia. He compared plaintiff's 1992 EMG studies to 1996 studies and found that her carpal tunnel symptoms were improving, but ascribed her diffuse pain over her arms and upper body to "a superimposed fibromyalgia type picture." He recommended that plaintiff not use knives or scissors and use the giblet machine only for short periods.
10. The plaintiff was placed on modified duty where she did hourly temperature checks and recorded the information on a clipboard on the line, collected wrap, and placed livers in cups. The plaintiff's hands would become numb from handling the chilled livers. The job also required continuous use of the hands and a steady pace of placing livers in cups and placing the cups on the conveyor belt.
11. On 4 June 1996, plaintiff complained to Dr. Hansen that she was being made to be on the giblet machine all day. This full-time work on the giblet machine exacerbated her bilateral carpal tunnel syndrome. The plaintiff was referred for physical therapy with Dr. Tetalman for three times per week for four weeks.
12. On 2 December 1996, Dr. Hansen noted plaintiff's continued pain and noted that although there is a short break every hour to check temperatures of products, fundamentally, the plaintiff is doing the same job all day long.
13. On 26 March 1997, Dr. Tetalman had restricted plaintiff to no repetitive hand motions, no use of knives or scissors, and no lifting over twenty pounds. The plaintiff told Dr. Tetalman that the employer was violating her work restrictions. Dr. Tetalman spoke to plaintiff's supervisor about her job rotation and approved specific duties for plaintiff after the supervisor stated that it was unclear exactly what the restrictions were.
14. On 1 April 1997, Dr. Tetalman found plaintiff to be at maximum medical improvement and rated the plaintiff as retaining a seven percent permanent partial impairment rating to each of her upper extremities.
15. On 30 May 1997, the plaintiff treated with Dr. Daniel Lee of East Carolina Neurology. Dr. Lee is a board certified neurologist, psychiatrist, and sleep disorder specialist. Dr. Lee ordered EMG studies.
16. In July of 1997, plaintiff returned to Dr. Hansen, who continued her on modified duty. Dr. Hansen also explained to plaintiff that for the most part, all the jobs at the plant are repetitive and that she should insist that the work restrictions be followed.
17. On 3 November 1997, Dr. Hansen advised plaintiff that he recommended continuation of the present treatment and work restrictions. He also noted the presence of some elements of fibromyalgia.
18. On 2 February 1998, Dr. Hansen told plaintiff that her duties at the plant were minimal and he could not conceive of how they could be made any lighter. He further stated that if the job caused her so much pain, she had the option of stopping work and pursuing Social Security Disability.
19. The plaintiff last worked for defendant on 7 February 1998. In March of 1998, defendant sent plaintiff a letter to return to work. However, when plaintiff returned to work with the medications prescribed by Dr. Anthony, she was sent home. She did not return to work after that incident. She was unable to work because of the accepted compensable carpal tunnel syndrome superimposed on fibromyalgia. She received short-term disability through an employer-funded plan at the rate of $190.00 per week for twenty-six weeks.
20. On 23 April 1998, an EMG showed continuing carpal tunnel syndrome with no significant worsening, although plaintiff was still presenting with pain and swelling. Dr. Hansen further opined that on the modified duty, plaintiff's carpal tunnel condition had stabilized and he did not believe anything further could be done for her.
21. Fred Clark, plaintiff's last supervisor, admitted that there were times when plaintiff stood around and did not do very much. She would check temperatures for about twenty minutes and then walk around doing odd jobs. This was a "make work" job and was not indicative of plaintiff's wage earning capacity.
22. In the fifty-two weeks prior to 7 February 1998, plaintiff earned $7.50 per hour for forty hours per week. This yields an average weekly wage of $300.00 and a compensation rate of $200.01.
23. Due to plaintiff's accepted compensable carpal tunnel syndrome superimposed on fibromyalgia, plaintiff is unable to earn wages. This condition is not likely to improve and is likely to be permanent. Payment of disability under the company's disability income plan is also evidence of inability to earn wages.
24. Plaintiff is disabled by constant and debilitating pain. Dr. Hansen could not disagree with that and would not criticize her decision to stop working as of February 1998. Dr. Anthony has approved her medical absence from work. Plaintiff's carpal tunnel syndrome is part of this complex, along with fibromyalgia. Plaintiff's compensable occupational disease, carpal tunnel syndrome, in combination with her other medical problems, including fibromyalgia, now renders her effectively totally disabled and entitled to benefits under N.C. Gen. Stat. §97-29.
***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. A job which is specifically created for an injured worker and is not generally available to other individuals in a competitive job market is "make work" and is not evidence of plaintiff's wage-earning capacity nor does it qualify to rebut plaintiff's presumption of continuing disability resulting from an accepted occupational disease. Peoples v. Cone Mills,316 N.C. 426, 342 S.E.2d 798 (1986). Likewise, a job which is so modified that it does not accurately reflect a plaintiff's ability to earn wages in the competitive job market does not rebut plaintiff's presumption of continuing disability. Therefore, plaintiff's refusal to return to the proffered job, which was "make work," was justified. N.C. Gen. Stat. §97-18.1; § 97-32.
2. The plaintiff is entitled to permanent total disability compensation at the rate of $200.01 per week from February 7, 1998, since she is unable to earn wages because of her compensable carpal tunnel syndrome and its interactions with fibromyalgia. N.C. Gen. Stat. § 97-29.
3. The plaintiff is entitled to have the defendant pay for medical expenses incurred, or to be incurred, in connection with her compensable carpal tunnel syndrome and its interaction with fibromyalgia. N.C. Gen. Stat. §§ 97-2 (19), -25.
4. Defendants are entitled to a credit against continuing disability payments for payments made pursuant to the employer-sponsored disability program.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, the defendant shall pay permanent disability compensation at the rate of $200.01 per week from February 7, 1998, until plaintiff returns to work at her former wages or until further order of the Industrial Commission. Compensation which has accrued shall be paid in a lump sum. Thereafter, weekly payments shall be made to plaintiff, with every fourth check going directly to plaintiff's counsel.
2. A reasonable attorney's fee of twenty-five percent of the compensation awarded plaintiff in paragraph 1 is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
3. Interest at the rate of 8 percent per year shall be paid on all compensation from June 8, 1998, the date of the hearing before the Deputy Commissioner, until paid.
4. Defendants shall pay medical compensation, in accordance with the Industrial Commission's Medical Fee Schedule, to all providers whose treatment was reasonably designed to effect a cure or provide relief from plaintiff's condition related to her compensable carpal tunnel syndrome and its interaction with her other medical conditions, including fibromyalgia. Defendant shall continue to provide such medical compensation as needed in the future.
5. Defendant shall pay the costs.
This 29th day of September 1999.
S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_____________ BERNADINE S. BALLANCE COMMISSIONER